# IN THE SUPREME COURT OF IOWA

No. 18–0081

Filed June 5, 2020

**STATE OF IOWA,**

Appellee,

vs.

**KAMIE JO SCHIEBOUT,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Sioux County, Patrick H. Tott (trial and sentencing) and Jeffrey A. Neary (restitution order), Judges.

The defendant requests further review of a court of appeals decision affirming her conviction for theft. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED FOR DISMISSAL.**

Mark C. Smith (until withdrawal) and Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas J. Ogden, Assistant Attorney General, and Thomas Kunstle, County Attorney, for appellee.

**McDERMOTT, Justice.**

Kamie Jo Schiebout wrote checks without authorization from a bank account that was not hers. The State charged her with violating Iowa Code section 714.1(6) (2015), which provides a person commits theft "if the person knows that such check . . . will not be paid when presented." All seven checks the State charged Schiebout with writing were paid when presented. The jury nonetheless found Schiebout guilty.

This appeal requires us to address the types of conduct Iowa Code section 714.1(6) forbids. Schiebout contends the State's evidence presented at trial was insufficient to show she knew the checks would not be paid when presented. Schiebout argues presenting a check without authorization, which was the substance of the State's evidence, is different than providing a check one knows will not be paid when presented, which is the subject of section 714.1(6). As a result, Schiebout asserts the district court committed reversible error in denying her motion for acquittal at trial.

We agree. The text of section 714.1(6) forbids knowingly presenting a check that will not be paid when presented. Evidence that she presented checks without authorization is, without more, insufficient to establish this particular crime. Because the State failed to present sufficient evidence supporting a conviction under section 714.1(6) and, specifically, that Schiebout knew the checks would not be paid when presented, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for dismissal.

## I. Background Facts and Proceedings.

Schiebout's former husband, Matthew, served as treasurer of Sandy Hollow Ducks Unlimited, the local chapter of the national Ducks Unlimited organization. The chapter had a checking account at American State

Bank. Only two people had signature authority on the checking account: Matthew, as the chapter's treasurer, and the chapter's president. Matthew kept the chapter's checkbooks in the basement of the house he had shared with Schiebout before their separation.

Schiebout had never been a member of the chapter and never had check-writing authority on the chapter account. Nonetheless, months after Matthew and Schiebout separated and Matthew moved out, Schiebout wrote a series of unauthorized checks on the chapter's account, signing her own name on each check.

Over a two-month period, twelve checks were drawn on the account. Only one was written by the chapter president or treasurer. Despite this, the bank honored all twelve checks, even those presented after the account ultimately became overdrawn. The bank mailed several overdraft notices to Matthew, but he didn't open any of them. Matthew first learned someone had been writing unauthorized checks on the chapter's account when the bank eventually reached him by phone. Upon examining the check images at the bank, Matthew recognized the signatures as Schiebout's. He reported the matter to the Orange City Police Department.

Around this time, but before the police had contacted her, Schiebout wrote two more checks on the chapter's account at Schweser's, a clothing store. Schiebout knew the store clerk and told her the checks were "her husband's." Unlike with the other checks, the bank did not honor either check to Schweser's because the account was overdrawn. No evidence suggests Schiebout thereafter attempted to pass any more checks. Schiebout told an employee at the bank she had "grabbed the wrong checkbook."

The State charged Schiebout with second-degree theft under Iowa Code sections 714.1(6) and 714.2(2), and as a habitual offender under

Iowa Code sections 902.8 and 902.9(1)(*c*) based on prior criminal convictions. At trial, the State presented evidence on eleven checks, but the jury was instructed to consider only seven checks as instances of alleged theft. The two checks Schiebout unsuccessfully passed at Schweser's were presented but not charged as part of the theft.

At trial, the State provided images of five of the seven checks that were charged. The State could not present images of two of the checks because the merchant, Wal-Mart, processed them as "automated clearinghouse" (or ACH) withdrawals in which Wal-Mart converted the paper checks into an electronic transfer that pulled funds from the checking account. With the funds electronically transferred, Wal-Mart handed the checks back to Schiebout without submitting the checks to the bank. For the two Wal-Mart checks, the State instead presented receipts showing the check numbers and store photos and video surveillance of Schiebout at both the register and leaving with a cart of items, all of which coincided with the dates and locations of the ACH transfers.

The State asked the jury to consider Schiebout's actions as part of a single scheme and, thus, to aggregate the seven checks in calculating the total value of property to determine the degree of theft. The seven checks totaled $1256.93.

The four other checks that came into evidence, including the two Schweser's checks, were not made part of the charged theft but instead were offered to help prove elements of the charged crime. Matthew identified the signature on every check admitted into evidence as Schiebout's. Two checks contained Schiebout's personal information, such as her driver's license number or date of birth, handwritten across the top.

At the close of the State's evidence, Schiebout moved for judgment of acquittal, arguing the State failed to prove the knowledge element of section 714.1(6). The district court took the motion under advisement. Schiebout made a renewed motion for acquittal after the defense concluded its case, which the district court again took under advisement.

The district court ultimately denied the motion for acquittal in an oral order in which the court noted its reliance on *State v. James* concerning the knowledge element. 310 N.W.2d 197 (Iowa 1981), *overruled by State v. Hogrefe*, 557 N.W.2d 871 (Iowa 1996). The district court found the State had provided sufficient evidence on the knowledge element because Schiebout "was aware that she was not an authorized signer on this account" and "not being an authorized signer . . . she should have known that they would not be accepted and could not have been accepted in a legal fashion by the bank."

The district court instructed the jury on the knowledge element, Jury Instruction No. 13, as follows:

> For the defendant to know something means she had a conscious awareness that at the time she gave the checks to the various businesses they would not be paid by the bank because the defendant was not an authorized signer on the account on which the checks were drawn.

The jury found Schiebout guilty of second-degree theft. At a second trial focused on Schiebout's habitual offender status, the jury found Schiebout to be a habitual offender under Iowa Code section 902.8. The district court sentenced her to an indeterminate prison term of fifteen years, with a mandatory minimum of three years based on her habitual offender status. The district court found Schiebout lacked the ability to pay certain items of restitution and waived other costs.

Shortly thereafter, the district court ordered Schiebout to pay the Sioux County Sheriff's Office $28,136.31 for medical services provided while she was a detainee there. At the hearing, Schiebout did not receive and did not have counsel representing her. Distinguishing other types of restitution, the district court held Iowa law does not require an ability-to-pay determination before ordering a convicted person to pay for medical aid.

Schiebout appealed. She asserted the district court erred in denying the motion for judgment of acquittal because there was insufficient evidence both that Schiebout knew the checks would not be paid when presented and that she obtained property or services in exchange for the checks. Schiebout alternatively sought a new trial asserting the jury was not properly instructed on the checks it was allowed to aggregate to meet the dollar amount threshold for second-degree theft. Schiebout also asserted the district court's ruling imposing the sheriff's claim for reimbursement of the medical aid costs was improper and that she was entitled to counsel at the hearing.

We transferred the appeal to the court of appeals. The court of appeals affirmed Schiebout's conviction on the sufficiency of evidence, accepting the contention that knowledge of her lack of authorization in presenting the checks satisfied the knowledge element under section 714.1(6). The court of appeals further found no error in the jury instruction on aggregating the dollar amounts of the checks. On the district court's order concerning payment for medical aid, the State, on appeal, conceded medical aid is subject to the reasonable-ability-to-pay requirement if treated as restitution under section 910.2 and further conceded Schiebout was entitled to counsel at the restitution hearing. The

court of appeals vacated the order requiring payment for medical aid and remanded for further proceedings.

We granted Schiebout's application for further review.

## II. Standard of Review.

Issues of statutory interpretation are reviewed for correction of legal error. *State v. Nall*, 894 N.W.2d 514, 517 (Iowa 2017). We likewise review claims of insufficient evidence for correction of legal error. *Id.* We will uphold the verdict on a sufficiency-of-evidence claim if substantial evidence supports it. *State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019). In reviewing a challenge to the sufficiency of evidence supporting a guilty verdict, we consider "all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). Evidence is substantial "if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Trane*, 934 N.W.2d at 455 (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)).

## III. Analysis.

Iowa Code section 714.1(6) states,

> A person commits theft when the person . . . [m]akes, utters, draws, delivers, or gives any check, share draft, draft, or written order on any bank . . . and obtains property, the use of property, including rental property, or service in exchange for such instrument, if the person knows that such check, share draft, draft, or written order will not be paid when presented.
>
> *a.* Whenever the drawee of such instrument has refused payment because of insufficient funds, and the maker has not paid the holder of the instrument the amount due thereon within ten days of the maker's receipt of notice from the holder that payment has been refused by the drawee, the

court or jury may infer from such facts that the maker knew that the instrument would not be paid on presentation. . . .

*b.* Whenever the drawee of such instrument has refused payment because the maker has no account with the drawee, the court or jury may infer from such fact that the maker knew that the instrument would not be paid on presentation.

Interpreting the key words of this statute, to support a conviction the State must thus prove "when the person . . . gives any check" the person "knows" the check "will not be paid when presented." *Id.*

Unless otherwise defined by the legislature, we give words their ordinary meaning. *State v. Damme*, ___ N.W.2d ___, ___ (Iowa 2020). "Interpreting a statute requires us to assess it in its entirety to ensure our interpretation is harmonious with the statute as a whole rather than assessing isolated words or phrases." *State v. Pettijohn*, 899 N.W.2d 1, 16 (Iowa 2017).

On the knowledge element, the State's evidence focused almost completely on Schiebout's lack of authorization to write checks on the chapter's checking account. The State succinctly states its argument in its appeal brief: "A reasonable juror could conclude that because Schiebout knew she was not authorized to sign the checks, she knew the bank would not pay them." But the State's argument, without more, invites a logical fallacy because the premise doesn't require the conclusion. The State presented evidence of Schiebout's lack of authority to write checks from the account, but the record contains no other evidence on the determinative issue: whether Schiebout *knew* the bank would fail to pay the checks *when she presented them.*

The district court instructed the jury the State must prove Schiebout possessed a "conscious awareness" that the checks would not be paid when presented because she was not an authorized signer on the account.

Jury Instruction No. 13; *see also* Jury Instruction No. 14 (knowledge element requiring State to prove Schiebout "knew at the time she gave the checks to local organizations or businesses that they would not be paid by the bank because [she] was not an authorized signer on the account"); *Sahu v. Iowa Bd. of Med. Exam'rs*, 537 N.W.2d 674, 678 (Iowa 1995) (defining "knowledge" to mean the defendant had a "conscious awareness" of the element requiring knowledge). Jury instructions, when not objected to, become the law of the case for purposes of appellate review for sufficiency-of-evidence claims. *State v. Canal*, 773 N.W.2d 528, 530 (Iowa 2009). The evidence in this case was insufficient to support a finding that Schiebout, simply because she was not an authorized signer on the account, possessed a conscious awareness that the checks would not be paid when presented.

Any such claimed knowledge by Schiebout clashes with the reality that the bank did in fact pay each of the checks. That the bank paid the checks when presented is not determinative on the issue of Schiebout's knowledge. But there was no other sufficient evidence presented from which to conclude Schiebout *knew*—in this case, contrary to fact—that the bank would refuse payment when she presented the checks. The statements Schiebout made that the checks were "her husband's" or that she "grabbed the wrong checkbook" at best show knowledge she lacked authorization on the account, not that she knew the bank wouldn't pay the checks when she presented them.

Indeed, her experience would have provided her with knowledge going the other direction—that the bank always paid the checks when she presented them. In particular, her two experiences at Wal-Mart, in which the check was electronically submitted through the ACH payment process as she stood by the cashier's stand, reasonably would have confirmed for

her the bank's practice of paying each check when presented. Businesses that accepted two other checks presented at trial (but that were not among the seven checks considered by the jury as charged) likewise processed the checks as ACH transfers.

Section 714.1(6) includes two presumptions establishing a defendant's knowledge, but neither applies in this case. Subsections 714.1(6)(*a*) and (*b*) apply only when "the drawee of such instrument has refused payment." Iowa Code § 714.1(6)(*a*)–(*b*). The drawee, American State Bank, did not refuse payment on any of the seven checks. By the plain language of these subsections, as applied to the facts of this case, these presumptions are not triggered.

The State correctly cites our prior observation that the Iowa theft statute is "modeled after the Model Penal Code, with slight variation." *State v. Donaldson*, 663 N.W.2d 882, 885 (Iowa 2003). But Iowa Code section 714.1(6) and the associated Model Penal Code section 224.5 addressing theft by bad checks differ in a manner significant in this case.

Unlike Iowa's theft statute, the Model Penal Code states a person is presumed to know that the check would not be paid "if . . . the issuer had no account with the drawee at the time the check or order was issued." Model Penal Code § 224.5 (Am. Law Inst. 1980). But the absence of this language in Iowa Code section 714.1(6) means the district court couldn't presume Schiebout knew the checks wouldn't be paid merely because the bank account didn't belong to her. We're bound by the language of the statute as enacted, not by the unenacted language of the Model Penal Code. *See, e.g., State v. Isaac*, 756 N.W.2d 817, 821 (Iowa 2008) (finding Iowa Code section 709.9 (2005) narrower than its associated Model Penal Code provision). We interpret and apply statutes using "the legislature's chosen statutory language, 'not what it should or might have said.' " *State*

*v. Ross*, 941 N.W.2d 341, 346 (Iowa 2020) (quoting *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 590 (Iowa 2004)). We can't exercise legislative power to amend the Iowa Code "in the guise of interpretation." *In re Det. of Geltz*, 840 N.W.2d 273, 280 (Iowa 2013).

As we've noted previously, Iowa Code section 714.1 prescribes ten different ways a person can commit theft. *Nall*, 894 N.W.2d at 518–19 (providing historical background on Iowa's theft statutes). That there might be another subsection of Iowa's theft statute arguably better suited to the facts of this case isn't before us. We've previously noted Iowa's theft-by-check statute (section 714.1(6)) deals with "a common means of theft (bad checks) with potentially difficult questions of proof," while the theft-by-deception statute (section 714.1(3)) "is meant as a catch-all crime to encompass the full and ever changing varieties of deception." *Hogrefe*, 557 N.W.2d at 878. As to these two statutes, "[f]actual scenarios may overlap, but the legal schemes in which they are situated are complementary rather than redundant." *Id.*

We hold the district court erred in denying Schiebout's motion for acquittal and, therefore, vacate the court of appeals decision and reverse the district court's judgment of conviction with instructions that the charges be dismissed. *See Nall*, 894 N.W.2d at 524–25; *Isaac*, 756 N.W.2d at 821.

Concerning the district court's restitution order charging Schiebout for medical aid pursuant to Iowa Code section 356.7, a prisoner may be charged for such costs only if "convicted of a criminal offense or sentenced for contempt of court for violation of a domestic abuse order." Iowa Code section 356.7(1) (2015). With Schiebout's conviction vacated, she cannot be held liable under section 356.7 for these charges. *See id.*; *see also* Iowa Code § 910.2(1) (requiring "judgment of conviction" for a restitution order

to issue); *State v. Dudley*, 766 N.W.2d 606, 614 (Iowa 2009) (restitution procedures and standards of chapter 910 do not apply to an acquitted defendant). The district court's restitution order is thus similarly vacated.

**IV. Conclusion.**

For these reasons, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for an order dismissing the case.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED FOR DISMISSAL.**

All justices concur except Oxley and McDonald, JJ., who dissent.

**OXLEY, Justice (dissenting).**

I respectfully dissent from the majority's opinion.

This case reaches us on appeal from the district court's denial of Schiebout's motion for judgment of acquittal, which is the means by which we consider a challenge to the sufficiency of the evidence. "The principles governing our review of a district court's denial of a criminal defendant's motion for judgment of acquittal are well-established." *State v. Serrato*, 787 N.W.2d 462, 465 (Iowa 2010). Where the defendant does not challenge the jury instructions, those instructions become law of the case and define the law against which the evidence is measured. *See State v. Canal*, 773 N.W.2d 528, 530–31 (Iowa 2009). The majority gives lip service to this standard, but only after first providing its interpretation of Iowa Code section 714.1(6) (2015), an issue not before us since Schiebout did not challenge the jury instructions below.

Element 4 of Jury Instruction No. 14, the marshalling instruction, required the state to prove "[t]he Defendant knew *at the time she gave the checks to local organizations or businesses* that they would not be paid by the bank *because the Defendant was not an authorized signer on the account.*" (Emphasis added.) Jury Instruction No. 13 added a "conscious awareness" definition to the knowledge element, explaining,

> For the defendant to know something means she had a *conscious awareness* that at the time she gave the checks to the various businesses they would not be paid by the bank because the defendant was not an authorized signer on the account on which the checks were drawn.

(Emphasis added.)

In considering a sufficiency challenge, we "consider all of the record evidence viewed in the light most favorable to the State, including all

reasonable inferences that may be fairly drawn from the evidence." *State v. Thomas*, 847 N.W.2d 438, 442 (Iowa 2014) (quoting *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012)). "[T]he evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013) (quoting *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002)).

"Importantly, '[j]urors are not expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but may give effect to such inferences as common knowledge or their personal observation and experience may reasonably draw from the facts directly proved.'" *State v. Stevens*, 719 N.W.2d 547, 552 (Iowa 2006) (quoting *State v. Manning*, 224 N.W.2d 232, 236 (Iowa 1974) (affirming conviction against challenge to sufficiency of evidence to establish intent element of crime)). "Knowledge . . . may be proved by circumstantial evidence, and in a case like this that is usually necessary." *State v. Coburn*, 244 N.W.2d 560, 563 (Iowa 1976) (quoting *People v. Adams*, 340 P.2d 677, 679 (Cal. Dist. Ct. App. 1959)) (addressing "[k]nowledge of lack of sufficient funds and intent to defraud" under predecessor statute to section 714.1(6) and concluding "[t]he combined effect of the checks placed in evidence and the other testimony was to show inferentially the existence of such knowledge and intent" (quoting *Adams*, 340 P.2d at 679)).

Using these standards to measure the evidence against the instructions provided to the jury, the evidence was sufficient to allow the jury to make the fair inference that Schiebout knew she was not an authorized signer on the Ducks Unlimited account and that she had a conscious awareness when she wrote the checks that the bank would not cover the checks because of that fact. Kamie and Matthew Schiebout

separated in April 2015, and Kamie moved out of their shared home around July. Their divorce was final on November 29. Matthew closed their joint checking account in April, which upset Kamie when she learned the account was closed because Matthew was not keeping up on his support obligations. After Matthew opened an individual account, and while they were still married, Kamie snuck checks out of the back of his checkbook and wrote one or two checks. Although Matthew did not challenge her actions, he was careful not to allow her access to his checkbook again.

Kamie did not begin using the Ducks Unlimited checks until at or around the time their divorce was final in late November. She wrote at least two checks prior to presenting the first check to Wal-Mart that was processed as an ACH transaction. Unlike the individual account Matthew opened following their separation, the Ducks Unlimited checking account was owned by a nonprofit entity with which Kamie had no relationship. As the treasurer, Matthew never used the Ducks Unlimited checkbook for personal expenses, only to cover expenses related to an auction the organization hosted each year. The Ducks Unlimited checkbook was not on Matthew's dresser or in his pants pocket; Kamie had to sneak the checks out of storage in the basement of the house she no longer lived in. Based on the evidence that the checks she wrote were numbered at least 150 checks from the last properly authorized check, the jury could have found she went to lengths to avoid getting caught taking a book of checks out of the bottom of the box.

Kamie's knowledge that the bank would not pay checks she wrote as an unauthorized signer on the Ducks Unlimited account is also evidenced by the stories she told about her use of the checks. When questioned by the clerk at Schweser's clothing store about using a Ducks

Unlimited check, Kamie told the clerk it was her husband's check—clearly not true both because she was no longer married to Matthew and the account was not "his" account but owned by a nonprofit for which Matthew previously served as the treasurer. She told a different story to the bank's vice president when she said she mistakenly "grabbed the wrong checkbook"—a checkbook that she had to sneak out of storage in the basement.

From these "direct facts," the jury was well within its province to rely on its common knowledge and experience and reasonably infer that Kamie knew she was not authorized to write the Ducks Unlimited checks and she was consciously aware that would cause the bank not to pay them when presented to the bank. *See Stevens*, 719 N.W.2d at 552; *see also Delay-Wilson v. State*, 264 P.3d 375, 377 (Alaska Ct. App. 2011) (concluding the "evidence supported a reasonable conclusion by a jury that Delay-Wilson had not merely made a mistake when she issued the two checks . . . , but knew that there were insufficient funds in her accounts to pay the checks" to support conviction under statute criminalizing issuance of "a check knowing that it will not be honored by the drawee" (second quote Alaska Stat. § 11.46.280(a) (2008)). That there is other evidence from which the jury could have found differently does not mean the jury's verdict was unsupported by sufficient evidence.

The majority's opinion effectively requires nonpayment of the check by the bank as an element of the offense of theft by check under section 714.1(6). Whether or not nonpayment is required by the statute is not properly before us on a sufficiency review where the instructions were unchallenged and did not require nonpayment as an element. Nonetheless, the majority defines the statute as requiring the State to prove: " 'when the person . . . gives any check' the person 'knows' the check

'will not be paid when presented.' " The majority then concludes that standard is not met here, explaining "there was no other sufficient evidence presented from which to conclude Schiebout *knew*—in this case, contrary to fact—that the bank would refuse payment when she presented the checks." By starting with the language of the statute and its interpretation of that language to focus on the "person 'know[ing]' the check 'will not be paid when presented,' " the majority sets up an impossible evidentiary standard requiring the State to prove knowledge of a future event. Yet our cases consistently measure knowledge from the defendant's perspective at the time the check is issued, not what will happen in the future. *See State v. Hogrefe*, 557 N.W.2d 871, 879 (Iowa 1996) (reconciling discrepancies between theft by deception and theft by check in prior cases and holding "criminal liability should attach if *at the time the defendant issued the check*, the defendant (1) never had the intention to pay the check or (2) knew he or she would not be able to pay it"); *see also State v. Rojas-Cardona*, 503 N.W.2d 591, 595 (Iowa 1993) (affirming conviction based on evidence from which "a jury could find that *at the time he tendered the check* . . . , [defendant] knew his account was closed[; h]e therefore knew the check was worthless and would never be paid by the bank" (emphasis added)), *overruled on other grounds by Hogrefe*, 557 N.W.2d 871.

The majority also goes astray relying on the statutory inferences allowed when a bank in fact refuses payment of a check in certain circumstances, *see* Iowa Code § 714.1(6)(*a*)–(*b*), where no such inferences were addressed in the jury instructions. The statutory inferences are evidentiary standards, not elements of the crime. *See Coburn*, 244 N.W.2d at 562 (discussing the predecessor to section 714.1(6) and explaining that "the 10 day 'make good' notice provision in [Iowa] Code [section] 713.4 is

merely a rule of evidence, not an element of a [section] 713.3 offense"). The fact that section 714.1(6) includes statutory inferences does not preclude use of the theft by check statute when the checks are ultimately cashed by the bank, as the majority effectively holds. It just means the state must prove the requisite criminal intent without the benefit of the statutory inferences. When the statutory inferences of section 714.1(6) are unavailable, "[k]nowledge . . . , like any other fact, may [still] be proved by circumstantial evidence . . . ." *Id.* at 563 (quoting *Adams*, 340 P.2d at 679).

Finally, the majority's reliance on the statutory language discounts the language used in the instructions. Jury Instruction No. 13 and No. 14 follow the phrase "would not be paid by the bank" with the dependent clause "because the defendant was not an authorized signer on the account," putting the focus on the reason the checks would not be paid. Commentators have described the knowledge element as satisfied "where the party [issuing the check] knows that the check will be dishonored or *does not have any reasonable grounds for believing* that the check will be paid." 35 C.J.S. *False Pretenses* § 42 (2020) (emphasis added). This is consistent with our prior cases measuring knowledge from the defendant's perspective at the time the check is issued. *See Hogrefe*, 557 N.W.2d at 879; *Rojas-Cardona*, 503 N.W.2d at 595; *State v. James*, 310 N.W.2d 197, 200–01 (Iowa 1981) (describing the "guilty knowledge," or mens rea, required to violate section 714.1(6) as "obtaining . . . something of value through the use of a check which the perpetrator knows is worthless" (quoting *State v. Smith*, 300 N.W.2d 90, 92–93 (Iowa 1981))), *overruled on other grounds by Hogrefe*, 557 N.W.2d 871. It is also how the jury apparently understood the instructions, an understanding that was supported by the evidence.

I do not disagree with the majority's struggle with the ambiguous language of the statute.  But I do disagree with the majority's efforts to interpret the statute where that issue is not before us.

I respectfully dissent.

McDonald, J., joins this dissent.